(C.D. 2961)

Maui Varieties, Ltd.
American Customs Brokerage Co., Inc., et al. } *v.* United States

United States Customs Court, First Division

(Decided April 13, 1967)

*Glad & Tuttle* (*Edward N. Glad* and *Robert Glenn White* of counsel) for the plaintiffs.

*Barefoot Sanders*, Assistant Attorney General (*Samuel D. Spector* and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before OLIVER, WATSON, and RAO, Judges

RAO, Chief Judge: The merchandise involved in these cases, consolidated at the trial, consists of lacquered plastic articles imported from Japan on various dates during 1964. They were assessed with duty at 21 cents per pound and 17 per centum ad valorem under item 772.06, Tariff Schedules of the United States, as serving dishes. Plaintiffs' claims concern the classification of the merchandise described on the invoices as rice containers or tubs, candy bowls or boxes, hors d'oeuvre trays, and sushi or "sushioke" trays. It is claimed that none of the items is a serving dish; that the rice containers or tubs, and the candy bowls and boxes, are properly classifiable under item 772.15 as "other" plastic articles within the prefatory descriptive grouping at 17 per centum ad valorem and that the articles designated as hors d'oeuvre trays and sushi trays are dutiable under item 772.09 as trays at 17 per centum ad valorem.

The pertinent portion of the Tariff Schedules of the United States reads as follows:

> Articles chiefly used for preparing, serving, or storing food or beverages, or food or beverage ingredients; and household articles not specially provided for; all the foregoing of rubber or plastics:

> \*   \*   \*   \*   \*   \*   \*

| 772.06 | Plates, cups, saucers, soup bowls, cereal bowls, sugar bowls, creamers, gravy boats, serving dishes, and platters | 21¢ per lb. + 17% ad val. |
|--------|------|------|
| 772.09 | Trays | 17% ad val. |
| 772.15 | Other | 17% ad val. |

The record consists of pages from a catalog produced by the Japanese supplier (plaintiffs' exhibits 1, 2, and 3) ; samples representative of the imported merchandise (plaintiffs' exhibits 4 through 12) ; and the testimony of the following witnesses:

June Kamioka is a director of Standard Trading Co., a family owned business, one of the plaintiffs herein. She has been connected with the business for 12 years, manages the office, processes orders, does the banking, and keeps abreast of the market. She has handled merchandise such as that involved herein since 1947. The firm sells throughout Hawaii, to florists, restaurants, and retail stores.

Dean T. Kamitaki is general manager of Maui Varieties Limited, Inc., another plaintiff. He started the business 14 years ago, buys merchandise, and sells in Maui and the Island of Hawaii.

Lawrence H. Yokoyama has been a salesman with S. Hata Co., Ltd., also a plaintiff, for 11 years. His duties are to buy, sell, price, study the merchandise, and know the uses made of the goods he sells. He sells mostly in Honolulu but his business covers the entire state.

Minoru Nagasako has been secretary-treasurer of Honolulu Sales, Ltd., also a plaintiff, for about 24 years. His firm imports and sells Oriental merchandise at wholesale and retail and has salesmen throughout the State of Hawaii. His principal duties are taking care of the books and general internal matters, but he has had occasion to know or research the market for the various uses that can be made of the items his firm sells.

Junzo Matsu is president of Marukai Hawaii, Inc., and executive director of Marukai Trading, Inc. His duties include selling, buying, creating new items, and investigating the market. He sells to importers in Hawaii, San Francisco, and Los Angeles. He stays alternatively in Japan and in the United States, a year or two at a time. He sells items comparable to exhibits 1 through 12 to two of the plaintiffs herein.

Susumu Fujii is commodity expert in the line of merchandise involved herein and was called as a witness by plaintiffs and by defendant.

Haruyo Yoshioka is a public health nurse and a housewife and was called as a witness by defendant.

For the purpose of clarity, the merchandise and the testimony relating to it will be discussed in groups. The first consists of the articles known as rice containers, rice pots, rice tubs, or "Hanki,"

illustrated by plaintiffs' exhibits 1, 4, 5. They are round, comparatively deep vessels each having a cover and a spoon. The rims of exhibits 4 and 5 each have a cutout portion on which the spoon handle may rest when the cover is closed. The items come in different sizes for the service of two, three, five or more persons. The witnesses testified that they are used as containers for cooked rice from which portions of rice are dished by the housewife or waitress into small bowls which are served to the individual guests and members of the family. The container itself is stood on the floor when a meal is being served at low tables, Japanese style. When a high table is used, the container is usually placed on a side table or folding stand. While it is not the custom to place it on the dining table, some of the witnesses had seen this done. None of the witnesses called the container a "dish." Miss Kamioka said the article could also be used as a flower arrangement container.

Plaintiffs' exhibit 3 depicts a so-called sushioke or sushi tray. It appears to be a round, flat, fairly shallow vessel. According to Miss Kamioka, it comes in different sizes. The invoice dimensions range from 7¾ to 14⅛ inches in diameter by 2 inches in depth. Miss Kamioka testified that sushi means rice topped with raw fish or eggs and oke means tub, so the article is a rice tub. When the article is used to contain sushi, it is used on the table during the service of a meal. It can also be used for flower arrangement and for little snacks, such as potato chips.

Other merchandise is represented by exhibits 6 and 8, which are claimed to be hors d'oeuvre trays. Exhibit 6 is a round article, with a cover, about 11 inches in diameter and over 1½ inches deep. It contains another round, shallower article, divided into six compartments. Mr. Yokoyama had seen comparable items used to contain candies, peanuts, candied fruits, olives, or pickles, but had not seen them used during the service of a meal.

Exhibit 8 consists of a round covered top portion 10 inches in diameter, containing five small dishes, and a revolving stand to which it is attached. The cover depicts a Hawaiian scene and a map of the islands. Mr. Nagasako said it was a Lazy Susan and that he had seen articles comparable to it used to contain olives, dried squid, and peanuts, at a gathering of friends, but not during the service of a meal. It is sold primarily to tourists. Mr. Matsu had seen articles like exhibits 6 and 8 used to contain peanuts, Japanese rice cakes, and that kind of thing, but not in connection with the service of a meal. Mr. Fujii had seen exhibit 6 used for serving relishes with curry, rice curry, "eggnog [sic], bacon, and ginger, and said it was used with the service of other food. He had also seen it used with nuts and pickles when cocktails were served.

Another group of articles consists of so-called candy bowls or candy boxes. Exhibit 2 depicts three bowls, two with covers. Miss Kamioka said the third had a flat bottom measuring about 3 inches and curved out. She had seen such items used as containers for candy or potato chips, for flower arrangements, as powder or knickknack boxes, or to contain hairpins. She testified that, when they are used to contain candy or potato chips, they are generally placed on a coffee table; they are not used in the service of a meal. Mr. Kamitaki said that at times bonbons, cookies, or other delicacies are served in articles such as those depicted on exhibit 2, but not usually at mealtimes.

Exhibit 7 is a bowl having a diameter of about 6½ inches across the top, a smaller diameter at the bottom of the bowl portion, and having a still smaller foot. It has a cover. Mr. Yokoyama called this a candy box. He had seen it used in his home on a kitchen counter to hold money, or receipts, and in the bedroom to hold bobbypins or hairpins. He had seen it in other homes on the coffee table containing candies, and for floral arrangements in hospitals. He sold such items to military post exchanges. He had also seen them used to hold cookies, but had not seen them used during the service of a meal.

Exhibit 9 is a shallow bowl, 8½ inches in diameter. Exhibit 10 is a deeper bowl, 6½ inches in diameter, and has a cover. Exhibit 11 is a larger bowl, 9½ inches in diameter and 2¼ inches deep. It has a flat bottom 5 inches in diameter and has no cover. Exhibit 12 is a tray with three round boxes about 4 inches in diameter and having covers. Mr. Nagasako had seen exhibit 9 being used in his own home to hold potato chips and exhibit 10 to hold candy. He had seen exhibit 9 in other homes containing Japanese cakes which are served with tea after mealtime in the evening. Mr. Matsu had seen exhibits 7, 9, 10, and 11 used in Hawaii and San Francisco to hold candy, cookies, Japanese rice cakes, or potato chips. He had seen exhibit 9 and 11 used for flower arrangements. He had served cakes in his house in exhibit 9 with tea, after or between meals. Mrs. Yoshioka had seen little dishes like those of exhibit 12 used to hold candy. She had used an article similar to exhibit 9 to serve cookies with tea or coffee. She had seen potato chips served in it. She had a dish similar to exhibit 10, which she used as a candy dish, and one similar to exhibit 11, which she put fruits in. She had never seen exhibits 9, 10, 11, and 12 used in the service of a meal, but could think of such a use for exhibit 11. Mr. Fujii has seen exhibits 9 and 10 used for the service of cookies and candies with tea or coffee or at the end of a meal for dessert.

Since the collector classified all of the articles as serving dishes under item 772.06, the issues to be determined are the meaning of that term as used in the tariff schedules and whether plaintiffs have established that the imported articles, or any of them, are not within the scope of that term.

In a recent case, *New York Merchandise Co., Inc.* v. *United States*, 58 Cust. Ct. 93, C.D. 2895 (decided February 20, 1967), we held that the term "serving dishes" meant dishes from which individual portions of food are taken or served. The evidence in the instant case, as well as the presumption attaching to the collector's classification, establishes that all of the articles before us are so used, either at meals or after or between meals. The additional question presents itself as to whether the term "serving dishes" in item 772.06 is limited, as plaintiffs claim, to dishes chiefly used in the service of food at the table during a meal.

The term "dish" is a general one and includes any container or vessel, such as a platter, plate, or bowl, used for serving or holding food. (Webster's New International Dictionary, 1953 edition; Webster's New World Dictionary of the American Language, college edition, 1964.)

Plaintiffs have cited *United States* v. *Butler Bros.*, 33 CCPA 22, C.A.D. 310, which held, under the Tariff Act of 1930, that novelty articles, such as bonbon and candy dishes, not chiefly used in the service of meals, but used on bridge and occasional tables for the service of candy or nuts after a meal, did not fall within the term "tableware," as used in that act.

However, in a more recent case, *United States* v. *Bruce Duncan Co., Inc., a/c Kasuga Sales, Ltd., National Silver Company,* 50 CCPA 43, C.A.D. 817, the court held that "snack sets," each consisting of a plate having a well near its rim on one side and a standard tea cup, were classifiable as tableware. The court distinguished the *Butler* case on the ground that the bonbon dishes there were chiefly used after a meal. It then stated:

\* \* \* It is a matter of common knowledge which we judicially note that the more formal customs of dining which prevailed on the date of the enactment of the Tariff Act of 1930, have given way to more informal and less rigid practices of modern living. Thus, it is now common practice to eat "snacks" as well as more complete meals from counters, coffee tables, and snack or "T.V. tables" as well as the more conventional dining on tables of an earlier day. No longer are our meals identified with a traditional "table" in a traditional kitchen or dining room. They are as likely to be served in a living room or on a porch and the "ware" used therewith placed on whatever object is readily available for the purpose. The advent of television as a central household attraction (unfortunate as this may be) has helped create new eating habits complete with "unquiet meals". While such changes in eating habits can not properly be said to have been contemplated by the drafters of the 1930 Tariff Act, it seems to us the clear intent of the act was that "tableware", i.e., "ware" then used in the service of "meals" at a table, is properly descriptive of the present uses of "ware" such as the imported "snack sets". Such sets are particularly convenient for carrying a light snack from a point of service, such as the kitchen, to wherever the desired eating place happens to be. We do not agree with the contention of the importer that the trays or plates

of the snack sets are so particularly designed as to be suited to be held only in the user's hand or user's lap and would not be used as "ware" in serving a "meal" at a table. The imported snack sets, in usage, could indeed be held by the user, but so can conventional items of "tableware". In both instances, however, it is likely that they would more conveniently be placed on a small coffee table, card table, snack counter, snack table or a "T.V. table".

"Tableware," thus, is "ware" used in serving a "meal" at a table, whether or not the meal is a complete one or a "snack" and whether or not the table is a formal dining table or a coffee table, card table, snack counter, etc.

The Tariff Schedules of the United States do not use the word "tableware" but the general description "articles chiefly used for preparing, serving, or storing food or beverages, or food or beverage ingredients." (Schedule 5, part 2, subpart C; schedule 5, part 3, item 546; schedule 7, part 12, subpart C, item 772.) Explanatory notes issued by the tariff commission in connection with this language state:

* * * Thus, the term "tableware" is construed to include only those articles used for serving food or beverages at the table at mealtime. Hence, articles such as candy boxes, mugs, beer steins, and sandwich trays are held not to be "tableware" because they are not for serving food at the table at mealtime. It is believed that the proposed language with its somewhat broader scope will adequately cover the entire group of related articles. [Tariff Classification Study, schedule 5, p. 383.]

However, vestiges of the distinction were carried over to the tariff schedules in that separate items, 533.31 and 533.71, were provided for "the more important articles (not 'available in specified sets') not now classified as 'tableware' in paragraph 211 (item 533.31) and in paragraph 212 (item 533.71) but which are chiefly used for serving food or beverages." (Ibid., p. 385.) These items cover "Steins, mugs, candy boxes, decanters, punch bowls, pretzel dishes, tidbit dishes, tiered servers, and bonbon dishes," some of which would fall within a broad definition of "serving dishes."

Schedule 7, part 12, subpart C, does not include a similar provision, but the articles covered by item 772.06 are those normally regarded as dinnerware. It is significant that the term "serving dishes" appears between "gravy boats" and "platters." This is an indication that it was not the intent of Congress to include all articles used to serve food at any time or place within that item, but only those chiefly used for serving food at meals.

From the evidence presented, it is clear that the articles known as rice containers, rice pots, rice tubs, or "Hanki," illustrated by plaintiffs' exhibits 1, 4, and 5 are "serving dishes." They are used to contain cooked rice from which individual portions are served during the course of a meal. The fact that the container is customarily stood

on the floor when a meal is served at low tables, Japanese style, or placed on a side table when the meal is served at a high table is insignificant. Ordinary serving dishes, bowls, or platters in conventional dinnerware may be stood on sideboards or serving tables during meals, where they are available or where the dining table is crowded.

The use mentioned by Miss Kamioka, for flower arrangements, is obviously an incidental or fugitive use, since the article, with its cover and spoon, is obviously designed for serving food, and the weight of the evidence establishes that it is so used.

The evidence as to the so-called sushioke or sushi tray similarly establishes that it is used to contain food during the service of a meal, and there is nothing to show that that is not the chief use, although it may also be used for other purposes. As depicted in exhibit 3, it does not appear to be a tray, as claimed by plaintiffs, but an uncovered container in which, rather than on which, food or articles could be held or carried.

A tray is defined as an open receptacle with a flat bottom and a low rim or slightly raised edges, for holding, carrying, or exhibiting articles. (Webster's New International Dictionary, 1953 edition; Funk & Wagnalls New Standard Dictionary, 1956 edition; Webster's New World Dictionary of the American Language, college edition, 1964.) Cf. *Royal Cathay Trading Co. et al.* v. *United States*, 56 Cust. Ct. 371, C.D. 2662, where it was held that an article, such as a so-called silver tray, which contained things rather than supported them, was not a tray.

Exhibits 6 and 8 are not open receptacles, as they have covers; they are not shallow with low rims, but are vessels having inner compartments, into which rather than onto which, portions or articles of food may be put. The absence of a cover as distinguishing a tray from a box was noted in *Border Brokerage Co.* v. *United States*, 52 Cust. Ct. 275, Abstract 68333. That case involved core trays used in the diamond drilling industry, which were open at the top without any lid or cover and were divided into partitions by strips of plywood 1 inch in height. Plaintiff's claim that the articles were wooden packing boxes was overruled, the court stating:

In the course of its decision in the *Tower* case, *supra* [69 Treas. Dec. 309, T.D. 48152], sustaining the collector's classification of the merchandise, the court quoted definitions of "packing box" and then stated that "We do not think that the definitions of the word 'packing box' contemplate other than a box with completely solid sides, ends, bottoms, and tops, in which goods may be safely packed, * * *." The articles involved herein do not meet such description. Rather, the merchandise in question, as represented by the sample in evidence (exhibit 1, *supra*), conforms to the common meaning of "tray," defined in Webster's New International Dictionary as "Any open receptacle with a flat bottom and a low rim for holding or carrying

articles" and, in Funk & Wagnalls Dictionary, as "a shallow box without a cover, used in trunks or otherwise."

Some, but not all, dictionaries define a Lazy Susan as a revolving tray:

A revolving tray placed on a dining table to hold condiments, etc. [Webster's New International Dictionary, 1953 edition.]

A large, circular tray revolving on a base, used at table for holding articles of food, which, with the revolution of the tray, are passed to those at table. [The New Century Dictionary, 1946 edition.]

A revolving stand for condiments, bread, butter, etc., usually placed in the center of the table. [Britannica World Language Dictionary, 1963 edition.]

None of these definitions refers to an article with a cover, such as exhibit 8. Whether or not the term "trays" as used in item 772.15, *supra*, was intended to include an article defined as a revolving tray and called a Lazy Susan, we do not think it should be extended to include an article with a cover, which does not fall within the ordinary definition of a tray.

While these articles are not trays, are they serving dishes within the meaning of item 772.06? The witnesses testified that they are used to contain candies, peanuts, candied fruits, olives, pickles, dried squid, relishes, curry, or ginger. Several of the witnesses said they had not seen them used during the service of a meal, but Mr. Fujii had seen them used with the service of other food. This testimony is not very conclusive, particularly since it was confined to uses in Hawaii. While plaintiffs claim that the articles are Oriental in design and use and that the witnesses came from the principal areas of residence of Japanese-Americans, the record does not establish that these articles were sold to or used only by Japanese-Americans. In fact, Mr. Nagasako testified that exhibit 8 is sold primarily to tourists, and the court may judicially notice that tourists to Hawaii come from all states of the union and are not primarily Japanese-Americans. There is nothing about the samples which indicates that they could not be used as serving dishes during a meal. In fact, exhibit 8 seems particularly adapted to being placed in the center of an informal dining or breakfast table for the service of relishes, jellies, jams, or cheeses during the service of a meal. The evidence presented is not sufficient to establish that the articles represented by exhibits 6 and 8 are not chiefly used in the United States as serving dishes during the service of a meal.

The last group consists of the so-called candy bowls or boxes, exemplified by exhibits 2, 7, 9, 10, 11, and 12, which, according to the testimony and the appearance of the samples themselves, are susceptible of various uses. While most of the witnesses testified that they had not seen these articles used in the service of a meal, although they had

seen them used to serve candy, cookies, or potato chips at other times, their testimony is not sufficient to establish what the chief use of the articles was throughout the United States at the time of importation or to overcome the presumption arising from the collector's classification that they were chiefly used as serving dishes. The experience of the witnesses was confined to Hawaii and California, but the merchandise was sold to tourists as well as to the local trade and so presumably is used throughout the country. Such uses may well be different. The articles themselves do not indicate that use in one part of the country would necessarily be the same as that in another. Since chief use is a question of actual fact, in the circumstances here present, evidence as to use must cover more than one or two states in order to sustain plaintiffs' claim. *L. Tobert Co., Inc., American Shipping Co.* v. *United States*, 41 CCPA 161, C.A.D. 544; *Providence Import Co., Inc.* v. *United States*, 55 Cust. Ct. 243, C.D. 2584; *W. J. Byrnes & Co. et al.* v. *United States*, 57 Cust. Ct. 148, C.D. 2746.

For the reasons stated, the protests are overruled.

Judgment will be entered accordingly.